UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BASLER TURBO CONVERSIONS LLC,

    Plaintiff,

v.                              Case No. 08-C-732

HCC INSURANCE COMPANY,

    Defendant.

**DECISION AND ORDER DENYING
MOTION FOR DECLARATORY RELIEF**

This is an action for declaratory relief and damages in which Plaintiff Basler Turbo Conversions, LLC, ("BTC") seeks a determination of its rights, as well as proceeds due, under a policy of insurance issued by Defendant Houston Casualty Company ("HCC"). Specifically, BTC claims that a series of thefts it sustained between January and July of 2007 constitutes a single occurrence within the meaning of the policy such that it owes only one $5,000 deductible. The case was originally commenced in state court, but HCC removed it to federal court asserting diversity jurisdiction under 28 U.S.C. § 1332. The case is now before me on BTC's motion for declaratory relief on essentially stipulated facts. For the reasons that follow, BTC's motion will be denied.

**FACTS**

BTC, a limited liability company owned by two Wisconsin citizens and one Michigan citizen, specializes in aircraft conversions. (Second Am. Compl. P1.) BTC starts with a DC-3, overhauls the airframe and adds aerodynamic improvements and structural modifications that

increase strength and improve performance of the aircraft, which it then sells as a BT-67.[1] Between October 1, 2006 and October 1, 2007, BTC was insured under a policy issued by HCC, a Texas company with its principal place of business in Houston, Texas.

On July 24, 2007, BTC employees discovered that airplane parts were missing from one of its storage facilities in Black Wolf, Wisconsin. (Stip. of Facts ¶1.) The apparent theft was reported to the Winnebago County Sheriff Department and an investigation ensued. In the course of the investigation, a truck and trailer loaded with what appeared to be airplane parts was located in the driveway of one James M. Campbell. (*Id.* ¶2.) After BTC employees identified the content of the trailer as the missing airplane parts stolen from their storage facility, one Brian A. Francart, who was with Campbell at his residence when law enforcement officers arrived, admitted that he had assisted Campbell in loading the airplane parts onto his truck and trailer on three separate days in July 2007. Francart told investigators they sold the parts to a Sadoff Iron & Metal Company as scrap metal and split the proceeds evenly. (*Id.* ¶ 3-5.) Records from Sadoff Iron & Metal Company show that between January 8 and July 23, 2007, Campbell sold scrap metal to its yards in Fond du Lac and Oshkosh on 33 separate days. (Aff. of Thomas Knippel, Ex. A.) On 28 days, Sadoff purchased four different grades of stainless steel from Campbell. (*Id.*) Although it is not clear from the parties' stipulation, Sadoff's records apparently reveal that airplane parts stolen from BTC were among the scrap sold to Sadoff by Campbell on all or many of these occasions. Both Campbell and Francart are facing criminal charges in Winnebago County Circuit Court. (Stip. of Facts ¶ 6.)

---

[1] The parties neglected to explain BTC's business. On order to provide this item of background information, the Court visited BTC's website. http://www.baslerturbo.com/manufacturing.html (last visited Feb. 24, 2009).

Under Endorsement 17 of HCC's policy, entitled Aircraft All Risks Spares Coverage, HCC agreed to "pay for direct physical damage to or loss of engines, spare parts and equipment destined to be fitted to or to form part of an aircraft . . . ." (Doc. #19, Aff. of Christopher Bonnett, Attached Policy at 48.) The endorsement indicates that the deductible for "[e]ach occurrence/ conveyance/sending" is "per individual confirmations." (*Id.*) The written Confirmation of Insurance Coverage, which appears at the end of the policy, indicates the deductible for the Aircraft Spare Coverage (Endorsement 17) is "$5,000. EACH AND EVERY LOSS." (*Id.* Confirmation of Insurance Coverage at 3.)

BTC contends that the series of thefts by Campbell constitutes one "occurrence" under the policy and, as a result, it is required to pay only one $5,000 deductible. The policy states that the term "occurrence," when appearing in the policy in bold face print, means:

> an accident, including continuous or repeated exposure to conditions, which results in **bodily injury**, or **property damage** during the policy period neither expected not [sic] intended from the standpoint of the **Insured**, but this definition shall not be construed so as to preclude coverage for **bodily injury** or **property damage** resulting from efforts to prevent dangerous interference with the operation of the **aircraft**.

(Policy at 15.) BTC contends that under this definition, Campbell's continuous and repeated thefts of spare parts from its storage facility constitutes a single occurrence and, thus, only one deductible is owed.

HCC, on the other hand, contends that a separate loss occurred and, thus, a separate deductible is owed for each occasion that Campbell stole parts from BTC's storage facility. Even if the Court concludes that each separate act of theft does not necessarily constitute a separate

3

occurrence, HCC argues that the record as it stands is not sufficient to permit a determination whether all of the thefts are so linked as to amount to a single occurrence.

**DISCUSSION**

The interpretation of an insurance contract is a question of law. *Danbeck v. Am. Family Mut. Ins. Co.*, 2001 WI 91, ¶10, 245 Wis. 2d 186, 629 N.W.2d 150. The insurance contract is construed so as to give effect to the intention of the parties. *Id*. "The language of the policy is construed as it would be understood by a reasonable insured, and the reasonable expectations of coverage of an insured should be furthered by the interpretation given." *Schleusner v. IMT Ins. Co.*, 2006 WI App 240, ¶ 6, 297 Wis. 2d 368, ¶ 6, 724 N.W.2d 430, ¶ 6 (citing *Frost ex rel. Anderson v. Whitbeck*, 2002 WI 129, ¶ 20, 257 Wis. 2d 80, 654 N.W.2d 225). The words of the contract must be given their common and ordinary meaning, and when the language is unambiguous, the contract is enforced as written and no resort is made to rules of construction or the principles from the case law. *Danbeck*, 2001 WI 91, ¶10. "If the contract language is ambiguous, i.e., if it is susceptible to more than one reasonable interpretation, the language is construed in favor of coverage." *Id*.

In considering the question of whether a specific provision is ambiguous, it is appropriate to consider the language of the policy as a whole. "Occasionally a clear and unambiguous provision may be found ambiguous in the context of the entire policy." *Folkman v. Quamme*, 2003 WI 116, ¶ 19, 264 Wis. 2d 617, ¶ 19, 665 N.W.2d 857, ¶ 19 (citations omitted). Courts need not ". . . mechanically apply a clear provision regardless of the ambiguity created by the organization, labeling, explanation, inconsistency, omission, and text of the other provisions in the policy . . . ."

4

*Id*. It is also appropriate to consider the purpose and subject matter of the insurance. *Employers Health Ins. v. Gen. Cas. Co. of Wis.*, 161 Wis. 2d 937, 946, 469 N.W.2d 172 (1991).

In support of its contention that each of Campbell's thefts should be considered a single occurrence, BTC relies upon the policy definition of the term "occurrence". BTC cites an unpublished decision by the Wisconsin Court of Appeals in which similar policy language was applied to an almost identical set of facts. *Jonas Builders, Inc. v. United States Fidelity & Guaranty Co.*, 249 Wis. 2d 487, 2001 WL 1474775 (Wis. Ct. App. 2001), *petition for review denied*, 2002 WI 23, 250 Wis. 2d 556, 643 N.W.2d 93 (Table). In *Jonas Builders*, a thief stripped several of the insured's buildings of items made of copper or brass, including wiring, pipes and a boiler, over a two-month period and sold it for scrap, causing close to a million dollars in damage. The insured submitted the claim to his insurer who denied the claim based on several policy defenses, including the defense that each instance of theft constituted a separate occurrence subject to the policy's $25,000 deductible. Application of the $25,000 deductible to each instance of theft would have substantially reduced, and possibly even eliminated, the amount to be paid by the insurer. The case proceeded to trial and the jury found that repeated vandalism and theft of the insured's property constituted one occurrence under the policy which defined "occurrence" as "continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at ¶¶ 27, 31. The resulting judgment in favor of the insured was affirmed. BTC argues that *Jonas Builders* represents a proper application of Wisconsin law to facts essentially identical to those stipulated by the parties here and mandates judgment in its favor.

This result, BTC argues, is also consistent with Wisconsin's adoption of the "cause theory" to determine how many occurrences have taken place. *See Olsen v. Moore*, 56 Wis. 2d 340, 348-51,

5

202 N.W.2d 236 (1972). The cause theory was recently explained by the Wisconsin Supreme Court:

> Under the cause theory, "where a single, uninterrupted cause results in all of the injuries and damage, there is but one 'accident' or 'occurrence.' " *Welter v. Singer*, 126 Wis. 2d 242, 250, 376 N.W.2d 84 (Ct. App.1985). "If the cause is interrupted or replaced by another cause, the chain of causation is broken and there has been more than one accident or occurrence." *Id.*

*Plastics Engineering Co. v. Liberty Mutual Insurance Co.*, 2009 WI 13, ¶ 36, 759 N.W.2d 613. In *Plastics Engineering*, the Court applied the cause theory in holding that each individual claimant's repeated exposure to asbestos-containing products manufactured by the insured constituted a separate occurrence within the meaning of the liability coverage of the various Liberty Mutual policies there at issue. Liberty Mutual's policies, similar to HCC's, defined the term occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at ¶ 12. Later policies defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured," *id.*, which is virtually the same as HCC's policy. Applying the *Plastics Engineering* reasoning here, BTC argues that the series of thefts committed by Campbell over a six-month period constitute a single occurrence.

HCC, of course, sees the matter differently. HCC first argues that the policy definition of occurrence does not apply to the Aircraft All Risks Spares Coverage (Endorsement 17) under which BTC's claim arises. As noted above, the definition section of the policy states that the listed definitions only apply when the word being defined appears in bold faced print. Since the word occurrence does not appear in Endorsement 17 in bold faced print, HCC contends that the policy

6

definition does not apply to the Aircraft All Risks Spares Coverage. Instead, HCC contends that the word occurrence should be given its ordinary meaning. This does not mean, however, that HCC disputes BTC's contention that the cause test is the applicable standard.

HCC notes that *Olsen v. Moore*, 56 Wis. 2d 340, 202 N.W.2d 236 (1972), the case in which the Wisconsin Supreme Court adopted the cause theory, involved the interpretation of the word "occurrence", which had not been defined in the policy. *Olsen* concerned an automobile accident in which the defendant's vehicle had crossed the median on an interstate highway and collided with two oncoming vehicles almost instantaneously. *Id.* at 342. The plaintiffs, who were injured occupants of the two oncoming vehicles, claimed that the impact with each of the two cars constituted a separate occurrence for purposes of determining the limits of insurance proceeds available under Moore's automobile liability policy. The policy had limits of $10,000 per person and $20,000 per occurrence. *Id.* at 345. Thus, if the plaintiffs' view prevailed, the insurer's exposure would go from $20,000 to $40,000. Noting that the issue before it was whether the accident or occurrence should be viewed from the perspective of cause or effect, the Court explained:

> If viewed from the point of view of a cause, it would appear that a single, uninterrupted cause which results in a number of injuries or separate instances of property damage is yet one 'accident' or 'occurrence.' If, however, that cause is interrupted or replaced by another cause the chain of causation is broken and more than one accident or occurrence has taken place.

*Id.* at 349. The effect theory, on the other hand, viewed the accident from the perspective of the person injured. Under this theory, to which the Court observed only a small number of jurisdictions subscribed, each injury to a person constituted a separate accident or occurrence. *Id.* at 239-40. Rejecting the plaintiffs' argument that the policy language was ambiguous, the Court in *Olsen*

7

adopted the cause theory as more sound and concluded that there had been only one accident or occurrence since "[t]here was virtually no time or space interval between the two impacts." *Id.* at 350.

The Wisconsin Court of Appeals likewise applied the cause test to find only one occurrence in *Welter v. Singer*, 126 Wis. 2d 242, 376 N.W.2d 84 (Ct. App. 1985). In *Welter*, a driver struck a bicyclist, momentarily stopped, but then drove clear of the intersection, dragging bicyclist beneath the car. The driver stopped again and in apparent attempt to find reverse gear and again moved the car forward about a foot. The driver then exited the car, whereupon the injured bicyclist's companion got in and backed the vehicle about ten feet in attempt to free bicyclist. In rejecting the plaintiff's argument that the described series of events constituted four separate occurrences within the meaning of the driver's insurance policy, the Court of Appeals observed: "If cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, courts adopting the 'cause' analysis uniformly find a single occurrence or accident." *Id.* at 251.

In *Voigt v. Riesterer*, 187 Wis. 2d 459, 523 N.W.2d 133 (Ct. App. 1994), a case reflecting this State's serious problem with drunk driving, the Wisconsin Court of Appeals applied the cause test to reach the opposite result. In *Voigt*, the plaintiff was struck head-on by Bockman, a drunk driver who crossed the center line. Three to five minutes later, a second drunk driver struck the back of end of Brockman's vehicle, propelling it back into Voigt's and causing further injury. *Id.* at 462. Brockman was insured under a policy the provided limits of $100,000 per person and $300,000 per occurrence. Brockman's insurer paid Voigt its single person limit of $100,000 and terminated its defense of Brockman under a "defense termination clause" in its policy. Brockman

8

paid $40,000 in settlement of the remainder of Voigt's claim against him and then sued his insurer for reimbursement on the theory that the there had been two occurrences, instead of one, and thus a second per person limit came into play. The Court of Appeals agreed, explaining:

> we conclude that there were two occurrences within the meaning of the insurance policy. First, there was the collision when Brockman crossed the centerline and struck Voigt. Then there was a time interval of three to five minutes before the next impact occurred. The cause of the first impact was interrupted such that the cause and result were not simultaneous or so closely linked in time and space to be considered one event by the average person. Thus, by applying the ordinary meaning, the first impact and second impact were two separate occurrences.

*Id.* at 467.

Application of the same cause analysis used by the courts in *Olsen*, *Welter*, and *Voigt*, HCC argues, does not support BTC's contention that "as many as 33 separate thefts perpetrated between January 8, 2007, and July 24, 2007 are so closely linked in time and space that they must be considered as one occurrence subject to one deductible under the policy." (HCC Br. In Opp. at 7.) Instead, HCC contends, each of the multiple thefts, perpetrated on separate days over a six-month period, constitutes a separate occurrence subject to the $5,000 deductible. This conclusion is further supported, HCC contends, by the fact that its policy expressly states that the $5,000 deductible is for "EACH AND EVERY LOSS". (Confirmation of Coverage at 3 of 6.)

Finally, with respect to the Wisconsin Court of Appeals' decision in *Jonas Builders*, HCC argues that the result in that case was due to the procedural posture in which the issue arose, and should not be read as a definitive statement by the Court of Appeals on the question of what constitutes an occurrence. In *Jonas Builders*, the insurer argued on appeal that the trial court had erred in incorporating the definition of the term "occurrence" found in the liability coverage of the policy in the verdict and its instructions to the jury. The Court of Appeals concluded, however, that

9

the insurer had waived the issue by not objecting to the special verdict question and jury instructions at trial. 2002 WL 1474775, at ¶¶ 27-30. Thus, the court did not decide whether the trial court had properly defined the term occurrence, and its review was limited to whether, given that definition, the evidence was sufficient to support the verdict. *Id.* at ¶¶ 31-35. Under these circumstances, HCC argues, the result in *Jonas Builders* must be seen as a function of the standard of review rather than a statement of Wisconsin law on the question of what constitutes an occurrence under a property loss policy of insurance. (HCC Br. In Opp. at 8-9)

I agree with HCC that the policy definition of the term occurrence is not applicable to the coverage at issue here. Because the term "occurrence" does not appear in bold faced print in the Aircraft All Risks Coverage endorsement, the policy definition does not apply. Not only is this much clear from the language of the policy, it also follows from the nature of the different coverages provided. The word "occurrence" appears in bold faced print, and thus the special policy definition of the word applies, in the sections of the policy that describe the liability coverage for the insured. This includes Coverage B (Bodily Injury (excluding Passengers) and Property Damage (excluding Passengers' Baggage) Liability), Coverage C (Passenger Bodily Injury Liability), and Coverage D (Passengers' Baggage Liability). (Policy at 8, 12.) It does not appear in bold print, however, in those sections of the policy that provide first-party coverage for property loss. This includes Coverage A (All Risks Physical Damage - In Flight and Not In Flight)[2] and Endorsement 17 (Aircraft All Risks Spares Coverage). (Policy at 8, 11, 48.) This corresponds to the separate and distinct purposes behind liability coverage and coverage for property loss. *See, generally*, Maloney,

---

[2]One exception is in the section entitled "Insured's Duties When Loss Occurs." The policy states that the insured is to "file a proof of loss with the Company within sixty (60) days after the **occurrence** of loss . . . ." (Policy at 21.) Presumably, this is a misprint.

10

Francis F., *The Application of "Per-Occurrence" Deductible Provisions In First-Party Property Claims*, 37 Tort & Insurance Law Journal 921, 922-24 (2002).

Liability insurance is intended to protect the insured from the liability the insured incurs to others as a result of its own unintended but tortious conduct. *Newmont Mines v. Hanover Ins. Co.*, 784 F.2d 127, 136 (2d Cir. N.Y. 1986). Under the liability coverage of a policy, the insurer generally agrees to pay, as HCC did here with respect to Coverage C, for example, "all sums which the **insured** shall become legally obligated to pay as damages, because of **bodily injury** sustained by any passenger caused by an **occurrence** . . . ." (policy at 8), defined as "an accident, including continuous and repeated exposure to conditions, which results in **bodily injury** or **property damage** during the policy period neither expected [nor] intended from the standpoint of the **insured** . . . ." (Policy at 15.) Property insurance, on the other hand, is intended to provide financial protection against damage to or loss of property to the insured's own property. *Newmont Mines*, 784 F.2d at 136. The protection provided by property insurance is afforded whether the loss results from an accident or, as in this case, the intentional conduct of a third party. Because property insurance is intended to protect the insured against damage or loss to the insured's own property even if intentionally caused by a third party, the narrower policy definition of "occurrence" as "accident" would seem inapplicable. In plain terms, Campbell's theft of BTC's airplane parts was not an accident. If the policy definition applied, it would be questionable whether there would be any coverage at all.

The fact that the policy definition of the term "occurrence" is not intended to apply to the property coverage portions of the policy is further evidenced by the provisions governing HCC's limits of liability. With respect to Coverages B, C and D, the policy states: "For the purpose of

11

determining the limit of the Company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**." (Policy at 12.) No similar provision appears in the property insurance coverage sections of the policy. I therefore conclude that the policy definition of the term "occurrence" does not apply to those coverages. Specifically, I conclude that it does not apply to Endorsement 17. The holding of *Jonas Builders*, though not controlling in any event, is not to the contrary since the Court's holding in that case was predicated upon its finding that the insurer had waived the issue in the trial court below.

Having rejected BTC's contention that the policy definition applies, I now turn to the ordinary meaning of the word "occurrence." The word "occurrence" means "something that happens or takes place." *Merriam-Webster's Collegiate Dictionary*, 804 (10th 1999). Synonyms include "event, incident, episode, and circumstance." *Id.* Under this definition, it would seem that each time Campbell drove to BTC's storage facility and loaded his truck with spare airplane parts, there was a separate occurrence. Each theft would, to a reasonable insured, be considered a separate event, incident, or episode resulting in a separate loss that, if discovered, would permit a separate claim subject to a separate deductible and, likewise, a separate per occurrence limit. The fact that BTC may not have known of Campbell's actions does not change the analysis. The meaning of a contract does not change with the knowledge of the parties; otherwise it would have no fixed meaning and could not be consistently applied.

Analyzing the case using cause theory results in the same conclusion. As is clear from the Wisconsin cases that have addressed this issue in the context of an automobile accident, the fact that Campbell may have been the actor in each theft does not mean they were the result of a single cause

12

or constitute a single occurrence. No one would seriously argue that a person who accidently drove his car into the rear of the same vehicle on two consecutive days was involved in only one accident such that only one deductible was owed and only one per occurrence limit applicable. The same conclusion follows here. Although all of the thefts may have been committed by Campbell, this does not mean they had a single cause. Each theft was the result of a separate action that required a new decision by Campbell to get into his truck, drive to BTC's storage facility, and steal BTC's property. The actions by which he caused each theft were separated by time, some by weeks and even months, and interrupted by periods of sleep, meals and countless other activities of daily living. To consider them all as one occurrence would stretch the meaning of the term far beyond ordinary use.

BTC suggests that treating each theft as a separate occurrence, taken to its logical conclusion, could result in an insured never being able to recover "since it would be equally possible to then construe an occasion of theft as when each part is picked up." (Reply Br. at 4.) Assuming the thief was incapable of lifting more than $5,000 worth of parts at a time, no single theft would exceed the deductible. This argument, however, is a bit of a "straw man". No one is suggesting that each trip Campbell took to BTC's storage facility be divided into multiple occurrences based on the number of items he took. Any occurrence can be divided into any number of discrete actions or events that comprise the whole, and with respect to incidents that occur close in time, it may be difficult to determine where one occurrence ends and another begins. But this does not mean that there is no beginning or end such that as many as thirty-three incidents of theft over a six-month period must be treated as one occurrence. In seeking a determination that it owes only one

13

deductible for the entire series of thefts by Campbell, this is precisely what BTC is claiming the policy means. For the reasons stated, I conclude BTC is not entitled to such a declaration.

This is not to suggest that the issue is crystal clear. Courts from other jurisdictions have split on the issue. In *Peco Energy v. Boden*, 64 F.3d 852 (3rd Cir. 1995), for example, an electric utility presented a claim to its various insurers under a series of all risk policies for losses it sustained over a six-year period as a result of a multitude of thefts of fuel oil by an independent trucking firm with whom the utility had contracted to haul its fuel oil to various generating facilities. Each of the policies covered the loss but were subject to deductibles ranging from $20,000 in the first year to $100,000 per loss or occurrence in subsequent years. *Id.* at 854. The insurers argued that each of the thefts constituted a separate loss and were therefore subject to separate deductible. The case was tried to a jury, and the jury found that each theft was a part of a larger scheme and that the scheme to steal was the proximate cause of each theft. In denying the insurers' post-trial motions, the district court concluded on the basis of the jury's finding that the thefts constituted a single occurrence and only one deductible was owed. *Id.* at 856. The Third Circuit upheld the district court's determination that the multiple thefts constituted a single occurrence, noting that in deciding the number of occurrences, a court should determine "if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Id.* (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir.1982)). The Court concluded that "when a scheme to steal property is the proximate and continuing cause of a series or combination of thefts, the losses for liability insurance purposes constitute part of a single occurrence."

Likewise, in *EOTT Energy Corp. v. Storebrand International Insurance Co.*, 52 Cal. Rptr. 2d 894 (App. 1996), the California Court of Appeal held that 653 thefts of diesel fuel over an

14

eleven-month period by drivers for several tanker trucking companies who had been issued access cards so that they could haul the diesel fuel from the processing plant to the insured's storage facilities constituted a single loss within the meaning of the "all risk" property insurance policy. Looking to the objectively reasonable expectations of the insured, the Court observed:

> the term "occurrence" reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss. It appears reasonable to us that the term "occurrence" as used in the deductible clause is effectively referring to a loss. In our view, EOTT's objectively reasonable expectation would embrace the conclusion that multiple claims, all due to the same cause or a related cause, would be considered a single loss to which a single deductible would apply.

*Id*. at 898; *see also Business Interiors, Inc. v. Aetna Cas. & Sur. Co.*, 751 F.2d 361, 363 (10th Cir.1984) (employee embezzlement of $53,000 over 8 month period by the forgery or material alteration of 40 separate checks constituted a single loss since it was caused by "the continued dishonesty of one employee").

However, in *B.H.D., Inc. v. Nippon Insurance Company of Europe*, 54 Cal. Rptr. 2d 272 (App. 1996), the California Court of Appeal held that a series of thefts of jewelry by a woman posing as a buyer for Mexican-based jewelry stores two-to-three times per week over a four-month period did not constitute a single occurrence subject to only one $10,000 deductible under a casualty policy of insurance. The Court found the insured's contention that there was only one claim for loss untenable in that, "[w]hile the thefts were similar, each was a completed crime that would have supported a separate count in a criminal proceeding, and separate punishment." *Id.* at 274. The Court also noted "[t]his is not a case in which the thief had a general overall plan to steal a particular item or amount, or where he or she took advantage of a position of trust to embezzle an aggregate amount over an extended period." *Id.* It was in this respect that the Court attempted to distinguish

15

the case before it from the facts of *EOTT Energies*, although it relied primarily in the differences in the language of the policies at issue in the two cases.

Of course, differences in policy language are factors in each of the foregoing cases. In general, however, I conclude that the more persuasive argument and the ordinary meaning of the terms used in the policy here favor HCC's reading. The fact that a thief used the same *modus operandi* to commit a series of thefts against the same victim does not mean only one theft occurred. It was not a *modus operandi* or scheme that caused the succession of thefts to BTC's storage facility, but separate and independent human actions that were the product of human deliberation and choice separated by significant intervals of time. Under the cause theory of occurrence, this means that there were multiple occurrences and, thus, multiple deductions are applicable. While the result may seem harsh in this case where the number of occurrences translates into a reduced recovery, the cases discussed above make clear that on many occasions a finding of multiple occasions increases policy limits to the benefit of the insured. In either event, it is the ordinary meaning of the terms used in the policy that control. As the term is ordinarily understood, BTC's losses resulted from more than one occurrence.

Finally, it should be noted that this construction furthers a fundamental purpose of a deductible. One function of a deductible is to require the insured to share in the risk of loss, and thereby provide an incentive to fulfill his duty to protect and adequately maintain the insured property. *General Star Indem. Co. v. West Florida Village Inn, Inc.*, 874 So.2d 26, 33-34 (Fla. App. 2004). Treating each theft as a separate occurrence for purposes of determining whether a separate deductible is owed, increases the insured's incentive to watch over his property and make sure it is properly safeguarded. To require payment of only one deductible regardless of how many times

16

over how long a period of time property was stolen would encourage laxness on the part of the insured that would make theft more easy to accomplish. This would be inconsistent with one purpose of requiring a deductible in the first place.

## CONCLUSION

Accordingly, based on the undisputed facts before me and for the reasons set forth above, BTC's motion for a determination that it owes only one $5,000 deductible for the series of thefts of airplane parts that occurred at its storage facility between January and July of 2007 is denied. The Clerk is directed to place this matter on the Court's calendar for a telephone conference to address further proceedings as may be necessary to resolve the case.

**SO ORDERED** this   5th   day of March, 2009.

                                         s/ William C. Griesbach
                                         William C. Griesbach
                                         United States District Judge